**G.F. COMPANY, Plaintiff–Appellee,**

v.

**PAN OCEAN SHIPPING CO., LTD., aka, Panobulk America, Inc., Defendant–Appellant,**

**and**

**PAN QUEEN, Its engines, tackle, apparel and furniture; Banque Indosuez, Defendants.**

No. 92–56615.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 7, 1994.

Decided May 5, 1994.

---

* The Honorable James M. Burns, Senior United States District Judge for the District of Oregon, sitting by designation.

David E.R. Woolley, Williams Woolley Cogswell Nakazawa & Russell, Long Beach, CA, for defendant-appellant.

Dennis J. Seider, Seider & Reynolds, Los Angeles, CA, for plaintiff-appellee.

Before: HALL, LEAVY, and FERNANDEZ, Circuit Judges.

Opinion by Judge HALL.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Defendant Pan Ocean Shipping Company appeals the district court's summary judgment for plaintiff G.F. Company in an action under the Carriage of Goods by Sea Act for damages to plywood that Pan Ocean transported from the Far East to the United States. We conclude the district court erred

by invalidating the disclaimers on Pan Ocean's bills of lading and, accordingly, we reverse.

## I.

In 1988, G.F. Company purchased a cargo of wooden doorskins from Pyramid Trading Company, a Taiwanese supplier, and arranged for shipment from the port at Kaohsiung via the M/V Pan Queen, a vessel owned and operated by Pan Ocean Shipping Company. Upon receiving the doorskins from Pyramid, Pan Ocean issued bills of lading for the cargo. The bills of lading, which provided that the goods were "in apparent good order and condition unless otherwise indicated," contained the following disclaimer (the "Wood Clause"):

> THE TERM APPARENT GOOD ORDER AND CONDITION WHEN USED IN THIS BILL OF LADING WITH REFERENCE TO IRON, STEEL OR METAL PRODUCTS OR WOOD PRODUCTS DOES NOT MEAN THAT THE GOODS, WHEN RECEIVED, WERE FREE OF VISIBLE RUST OR MOISTURE STAINING, CHAFING AND/OR BREAKAGE. IF THE SHIPPER SO REQUESTS, A SUBSTITUTE BILL OF LADING WILL BE ISSUED OMITTING THE ABOVE DEFINITION AND SETTING FORTH ANY NOTATIONS AS TO RUST OR MOISTURE STAINING, CHAFING AND/OR BREAKAGE WHICH MAY APPEAR ON THE MATES, OR TALLY CLERKS' RECEIPTS.

After the Pan Queen set sail and discharged its cargo in Charleston and New Orleans, G.F. discovered that the doorskins had significant physical damage. G.F. submitted timely claims for the loss to Panobulk America, Inc., Pan Ocean's claims agent, but was unable to settle with the carrier. Accordingly, G.F. filed suit in district court on December 27, 1990, three days before expiration of the limitations period.[1] In its complaint, G.F. named five entities (Panobulk, the Pan Queen, Banque Indosuez, and Does 1 and 2) but failed to include Pan Ocean.

After receiving the complaint, Panobulk filed an answer in which it raised as an affirmative defense the fact "[t]hat Panobulk is, and at all material times herein was[,] an agent of a disclosed principal or principals, and is therefore not liable to Plaintiff for its alleged loss." G.F. nevertheless moved for summary judgment against Panobulk, which responded by demonstrating that Pan Ocean owned the Pan Queen and that, as a result, Panobulk was not a proper defendant. Finally realizing its mistake, G.F. filed an *ex parte* motion to amend the complaint "to bring in Pan Ocean Shipping Co., Ltd., as a new defendant" pursuant to Federal Rule of Civil Procedure 15(c). After an expedited hearing, the district court granted the motion, dismissed all other defendants, and postponed consideration of G.F.'s summary judgment motion, which the court "deemed to be directed at Pan Ocean."

Ultimately, the court granted summary judgment in favor of G.F., holding that the Wood Clause was invalid and that, as a result, Pan Ocean was estopped from asserting that the doorskins were damaged prior to receipt from Pyramid. *See G.F. Co. v. Pan Ocean Shipping Co.*, 795 F.Supp. 1001 (C.D.Cal.1992). In so holding, the court followed *Portland Fish Co. v. States S.S. Co.*, 510 F.2d 628 (9th Cir.1974) (holding that a carrier is estopped from asserting that a shipper delivered a lesser weight of cargo than that listed on the bill of lading), and distinguished *Tokio Marine & Fire Ins. Co. v. Retla S.S. Co.*, 426 F.2d 1372 (9th Cir.1970) (holding that a disclaimer in the bill of lading permits a carrier to establish that the shipper had delivered damaged cargo).

Pan Ocean filed a timely appeal, contending that the district court erred by (1) permitting G.F. to amend its complaint after the statute of limitations had expired and (2) invalidating the Wood Clause. We conclude the court properly allowed G.F. to add Pan Ocean as a defendant but erred by not fol-

---

1. The relevant statute of limitations provides that aggrieved parties must file suit against a carrier "within one year after delivery of the goods." 46 U.S.C. App. § 1303(6). Panobulk, however, agreed to extend the period until December 30, 1990.

lowing *Tokio Marine* and upholding the Wood Clause.

## II.

■ Federal Rule of Civil Procedure 15(c) "is the only vehicle through which a plaintiff may amend his complaint, after a statute of limitation period has run, to accurately name a defendant who was not correctly named in the pleading before the limitation period had run." *Korn v. Royal Caribbean Cruise Line, Inc.*, 724 F.2d 1397, 1399 (9th Cir.1984). Generally a routine matter, our application of Rule 15(c) to this case is complicated by an amendment to the rule that occurred between the time G.F. filed its complaint (in December 1990) and the time the district court granted the motion to amend (in January 1992).

Old Rule 15(c), in effect for most of the district court proceedings, provided in relevant part:

> An amendment changing the party against whom a claim is asserted relates back if ..., *within the period provided by law for commencing the action against the party to be brought in by amendment* that party (1) has received such notice of the institution of the action that the party will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Fed.R.Civ. p. 15(c) (effective until Dec. 1, 1991) (emphasis added). The old rule therefore forbade party amendments unless the party to be added had notice of the action prior to the date on which the statute of limitations would have expired. *E.g., Schiavone v. Fortune*, 477 U.S. 21, 29, 106 S.Ct. 2379, 2384, 91 L.Ed.2d 18 (1986). As such, the rule spawned nonsensical results:

> [Old] Rule 15(c) created an anomaly. A plaintiff who filed a timely complaint has 120 days to serve the defendant with process. So a person properly named in the complaint might not know until four months after the running of the period of limitations that he was a defendant. But if the plaintiff mistook the defendant's name,

correction after the period of limitations would not relate back, and the suit would be untimely, even though the plaintiff served the proper person before the 120 days were up. A defendant served 10 days after the period of limitations would prevail if the original complaint contained a misnomer, while a defendant in the dark for 120 days could not plead the statute of limitations if the complaint identified him.

*Diaz v. Shallbetter*, 984 F.2d 850, 852 (7th Cir.1993) (citations omitted).

Because these results were "incongruous with Rule 15(c)'s equitable history and purpose," *Woods v. Indiana Univ.—Purdue Univ.*, 996 F.2d 880, 884 (7th Cir.1993), the Supreme Court amended the rule in 1991. New Rule 15(c) currently provides:

> An amendment of a pleading relates back to the date of the original pleading when ...
>
> (3) the amendment changes the party or the naming of the party against whom a claim is asserted if ..., *within the [120 day] period provided by Rule 4(j) for service of the summons and complaint,* the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Fed.R.Civ. p. 15(c) (effective Dec. 1, 1991) (emphasis added).

The new rule took effect on December 1, 1991, ten days prior to the date on which G.F. filed its motion to amend. We conclude that it is appropriate to apply the amended version and, in so doing, hold that the district court did not abuse its discretion in permitting G.F. to add Pan Ocean as a defendant. *See, e.g., Louisiana–Pacific Corp. v. ASARCO, Inc.*, 5 F.3d 431, 434 (9th Cir.1993) (reviewing determinations under Rule 15(c) for abuse of discretion).

## A.

■ In its order adopting and transmitting the amendment to Congress, the Supreme Court provided that new Rule 15(c) "shall take effect on December 1, 1991, and shall govern all proceedings in civil actions thereafter commenced and, *insofar as just and practicable,* all proceedings in civil actions then pending." 134 F.R.D. 525 (1991) (emphasis added). *See* 28 U.S.C. § 2074(a) (the Rules Enabling Act) (permitting the Court to "fix the extent [a] rule shall apply to proceedings then pending" unless retroactive application "would not be feasible or would work injustice"). We have not yet considered when this "just and practicable" standard is satisfied. *But see Louisiana–Pacific,* 5 F.3d at 434 (applying the old version without discussion).

Only the Seventh Circuit has addressed a situation similar to this case, in which the new rule took effect while litigation was pending before the district court. *Woods,* 996 F.2d at 885–86.[2] In that instance, the circuit court reversed and remanded because "the district court should have determined whether it was 'just and practicable' to determine the parties' rights and obligations under the new version of Rule 15(c).... Those determinations are for resolution by the district court and should be made on remand." *Id.* at 886.

■ Despite *Woods,* we think a remand is unnecessary in this case. First, the district court here *granted,* without explanation, the request to add a defendant. The court clearly felt, at least implicitly, that it was not unjust or impractical to do so. In *Woods,* on the other hand, the district court had denied the motion to amend, perhaps thinking itself unable to apply the amended rule. Thus, the *Woods* court needed to remand so that the lower court could at least consider applying the "just and practicable" test. And, second, given that "the general purpose of the [federal] Rules [is] to minimize technical obstacles to a determination of the controversy on its merits," *United States ex rel. Atkins v. Reiten,* 313 F.2d 673, 675 (9th Cir.1963), and that the old rule "was inconsistent with the liberal pleading practices secured by" the federal rules, Fed.R.Civ. p. 15(c), advisory committee's notes to the 1991 amendments, we see no reason not to apply the amended version to this case. *See Skoczylas,* 961 F.2d at 546 (refusing to apply old Rule 15(c) because it created a "now-obsolete procedural loophole"). We therefore analyze the propriety of G.F.'s motion to amend under new Rule 15(c).

## B.

In order for G.F.'s amendment to be valid under new Rule 15(c), Pan Ocean must have, within 120 days after December 30, 1990, (1) "received such notice of the institution of the action that [it would] not be prejudiced in maintaining a defense on the merits" and (2) "knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against" it. Fed.R.Civ. p. 15(c). Pan Ocean contends that neither element is satisfied in this case.

### 1.

■ Pan Ocean first argues that it did not receive actual notice of G.F.'s lawsuit until well after expiration of the time for service of process. We find this argument to be without merit because, in this case, notice to Panobulk was sufficient to satisfy Rule 15(c)'s requirements. Our decision in *Korn* is particularly on point. There, we reversed

---

**2.** Three circuits have applied the new rule to cases in which the amendments took effect only during the pendency of an *appeal. See Skoczylas v. Federal Bureau of Prisons,* 961 F.2d 543, 545–46 (5th Cir.1992); *Hill v. United States Postal Serv.,* 961 F.2d 153, 156 (11th Cir.1992); *Bayer v. United States Dep't of Treasury,* 956 F.2d 330, 335 (D.C.Cir.1992). Two other circuits, however, have refused to apply the new rule in analogous circumstances. *See Diaz,* 984 F.2d at 853; *Freund v. Fleetwood Enters.,* 956 F.2d 354, 362–

63 (1st Cir.1992); *see also Worthington v. Wilson,* 8 F.3d 1253, 1256 (7th Cir.1993) (declining to consider the issue because the "amended complaint did not relate back under either the old or new version of Rule 15(c)"); *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1076 (2d Cir. 1993) (stating, without discussion, "[t]he district court properly applied the version of Rule 15(c) in effect during the relevant time period").

We express no opinion on this issue.

a denial of the plaintiff's motion to add as defendant Royal Caribbean Cruise Line A/S ("RCCL A/S"), the owner of the ship on which he had been injured. In his complaint, the plaintiff had named only Royal Caribbean Cruise Line, Inc. ("RCCL, Inc."), RCCL A/S' marketing and sales agent. We concluded that there was "sufficient community of interest" between RCCL, Inc. and RCCL A/S to justify imputing knowledge of the action from the former to the latter entity. *Korn*, 724 F.2d at 1401. Most determinative of this conclusion was the fact that another entity that served as "RCCL A/S' agent for claims purposes[ ] knew full well of the pending suit and had been notified that the complaint was filed before expiration of the limitation period." *Id.*[3]

Similarly, a "community of interest" exists in this case. Panobulk was Pan Ocean's claims agent. Bob Deaney, the Panobulk manager who had handled Pan Ocean's claims for more than eleven years, was a primary drafter of the Wood Clause, and had sent holiday cards under Pan Ocean's name. Panobulk and Pan Ocean even had the same attorney, who defended against G.F.'s action for both parties. *Cf., e.g., Barkins v. International Inns, Inc.*, 825 F.2d 905, 907 (5th Cir.1987) ("Although Holiday Inns [the named defendant] and International Inns [the proper defendant] are separate entities, it is clear that International Inns was aware of the suit against Holiday Inns through the shared counsel.").

Cases from other circuits confirm that Rule 15(c) notice is satisfied when "the parties are so closely related in their business operations or other activities that the institution of an action against one serves to provide notice of the litigation to the other." 6A Charles Miller, et al., *Federal Practice and Procedure* § 1499 at 146 (2d ed. 1990) (cases cited therein). Such is the case with Panobulk and Pan Ocean.

**2.**

■ Pan Ocean next argues that G.F.'s amendment must fail because the carrier did not know that G.F. had made a mistake. In support, Pan Ocean cites *Kilkenny v. Arco Marine Inc.*, 800 F.2d 853 (9th Cir.1986), *cert. denied*, 480 U.S. 934, 107 S.Ct. 1575, 94 L.Ed.2d 766 (1987), in which we affirmed the denial of a motion under Rule 15(c) because the new defendant thought the plaintiff omitted it from the original complaint purely for tactical reasons. In *Kilkenny*, we noted that, although the named defendant had told the plaintiff that another entity was the proper defendant, the plaintiff never sought to amend its complaint within the limitations period:

A plaintiff's failure to amend its complaint to add a defendant after being notified of a mistake concerning the identity of a proper party ... may cause the unnamed party to conclude that it was not named because of strategic reasons rather than as a result of plaintiff's mistake.

. . . .

Rule 15(c) was intended to protect a plaintiff who mistakenly names a party and then discovers, after the relevant statute of limitations has run, the identity of the proper party. Rule 15(c) was never intended to assist a plaintiff who ignores or fails to respond in a reasonable fashion to notice of a potential party[.]

*Id.* at 857–58. *See also Louisiana–Pacific*, 5 F.3d at 434 (affirming the denial of a Rule 15(c) motion where "[t]here was no mistake of identity, but rather a conscious choice of whom to sue"). Pan Ocean claims that Panobulk's answer was sufficient to alert G.F. to its pleading error and that, under *Kilkenny*, Pan Ocean had reason to believe that G.F. was simply making a tactical decision not to sue it.

This argument would have more force if Panobulk's answer had actually stated that Pan Ocean was the proper defendant. Instead, the answer ambiguously recited that "Panobulk is, and at all material times herein was[,] an agent of a disclosed principal or principals, and is therefore not liable to

---

**3.** Despite Pan Ocean's assertions to the contrary, *Cooper v. U.S. Postal Serv.*, 740 F.2d 714 (9th Cir.1984), *cert. denied*, 471 U.S. 1022, 105 S.Ct. 2034, 85 L.Ed.2d 316 (1985), did not limit *Korn*.

Rather, *Cooper* merely reaffirmed the basic proposition that "the filing of an administrative claim does not impute notice of 'the institution of the action'" to the government. *Id.* at 717.

Plaintiff for its alleged loss." The complaint, which erroneously asserted that Panobulk owned, operated, and controlled the Pan Queen, illustrates that G.F. was mistaken. This mistake is confirmed by the affidavit of G.F.'s counsel, who explained that the omission of Pan Ocean was due to inadvertence rather than strategy, and by the fact that G.F. immediately sought to amend its complaint when Panobulk filed its summary judgment motion (explaining for the first time *why* it was not a proper defendant).

The complaint gave Pan Ocean reason to believe that G.F. had made a mistake. We therefore conclude that the district court did not abuse its discretion in granting G.F.'s motion to add Pan Ocean as a defendant.

### III.

Turning to the merits of the controversy, we first examine the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. App. §§ 1300–1315, which governs transactions involving the transportation of cargo into the United States via ocean carrier. Section 1303(3) of COGSA sets forth the following specifications for the bills of lading used in such transactions:

> After receiving the goods into his charge the carrier ... shall, on demand of the shipper, issue to the shipper a bill of lading showing among other things— ...
>
> (c) The apparent order and condition of the goods: *Provided,* That no carrier ... shall be bound to state or show in the bill of lading any marks, number, quantity, or weight which he has reasonable ground for suspecting not accurately to represent the goods actually received, or which he has had no reasonable means of checking.

*Id.* § 1303(3). COGSA further provides that "a bill of lading shall be prima facie evidence of the receipt by the carrier of the goods as therein described." *Id.* § 1303(4).

■ In the absence of the Wood Clause, therefore, Pan Ocean's bill of lading representations that the doorskins were "in apparent good order and condition" would estop the carrier from asserting that Pyramid had delivered damaged cargo to it. Pan Ocean contends, however, that the Wood Clause

qualified the representations and therefore enabled it to establish that the damage occurred prior to its receipt of the goods. G.F., on the other hand, asserts that the Wood Clause is invalid under COGSA as an attempt to alter § 1303(3)'s bill of lading requirements.

*Tokio Marine* and *Portland Fish* are the two relevant Ninth Circuit cases at issue. In *Tokio Marine,* a carrier of steel issued bills of lading nearly identical to those in this case. The documents stated that the carrier had received cargo in "apparent good order and condition," but they also contained the following disclaimer (the "Rust Clause"):

> THE TERM "APPARENT GOOD ORDER AND CONDITION" WHEN USED IN THIS BILL OF LADING WITH REFERENCE TO IRON, STEEL OR METAL PRODUCTS DOES NOT MEAN THAT THE GOODS, WHEN RECEIVED, WERE FREE OF VISIBLE RUST OR MOISTURE. IF THE SHIPPER SO REQUESTS, A SUBSTITUTE BILL OF LADING WILL BE ISSUED OMITTING THE ABOVE DEFINITION AND SETTING FORTH ANY NOTATIONS AS TO RUST OR MOISTURE WHICH MAY APPEAR ON THE MATES' OR TALLY CLERKS' RECEIPTS.

*Tokio Marine,* 426 F.2d at 1374. On appeal, we concluded that the Rust Clause enabled the carrier to establish that the shipper had delivered a rusted cargo of steel to it:

> Where a carrier issues a bill of lading which makes no representation with respect to the order and condition of the cargo, the carrier is not as a general rule estopped from showing that any damage was of preshipment origin....
>
> ....
>
> ... [T]he bills of lading here, "read fairly as a whole," show that the term "good order and condition" was qualified by the clause defining the term with respect to iron, steel, or metal products.... The consignee ..., an experienced importer of iron and steel products, [therefore] could not reasonably rely upon this qualified statement as an affirmative representation that the pipe was free from rust or mois-

ture when it was received by the carrier. [The carrier] was not estopped to deny liability.

*Id.* at 1376, 1377–78. As to COGSA, we found nothing in the statute "which would render invalid the qualifying clause." *Id.* at 1378. Noting that § 1303(3) requires a carrier to issue a bill of lading only "on demand of the shipper," we concluded that the consignee had no cause of action because the shipper had failed to demand a bill listing the condition of the goods. *Id.*

We decided *Portland Fish* four years later. In that case, the carrier issued a bill of lading stating that a cargo of tuna was "SAID TO WEIGH ... 30 SHORT TONS." *Portland Fish,* 510 F.2d at 630. Distinguishing *Tokio Marine* as a case in which reliance was not justified, *Id.* at 632 n. 13, we held that the bill of lading at issue estopped the carrier from arguing that it had not received a full thirty tons from the shipper: "[P]laintiff's reliance is manifest and was fully justified. The bill was 'clean'—the qualification 'said to weigh' did not befoul it." *Id.* at 633.

The district court in this case believed these two decisions to be inconsistent (noting that "it is difficult to envision why the plaintiff in *Portland Fish* was justified in relying on the bill of lading while the plaintiff in *Tokio Marine* was not," *G.F. Co.,* 795 F.Supp. at 1005 n. 3), but it nevertheless struggled to reconcile them. Ultimately, the court seized upon the "progressiveness" of the damage at issue, a distinction not mentioned in either decision but supposedly "consistent with COGSA's primary objective: to insure the negotiability of the bill of lading." *Id.* at 1005. The court reasoned as follows:

In *Tokio Marine,* the Rust Clause arose because, without it, "the progressive nature of the rusting process ... [would] force[ ] the carrier to detail every bit of moisture and rust that it detected at the time of shipment to protect itself against the likely possibility that the rusting process would reach fruition during carriage." *Id.* Thus, "[m]any 'unclean' bills of lading [would] result[ ]," thereby hindering negotiability. *Id.* Accordingly,

the disclaimer was valid because it "restored the negotiability to bills of lading used in connection with the transportation of steel while at the same time protecting ocean carriers from the undeterminable consequences of the rusting process." *Id.* In *Portland Fish,* on the other hand, "the problems associated with the rusting process ... were not present.... The weight of the cargo was fixed at the time of shipment; the carrier did not need protection against progressive change." *Id.* at 1006. The disclaimer was, therefore, invalid. In this case, "[n]either the staining, chafing, nor breakage of wood is the result of a progressive process. At the point of origin, the wood is either chafed, stained, or broken, or it is not." *Id.* As a result, the Wood Clause is invalid.

Interestingly, neither party on appeal attempts to justify the district court's reasoning. Pan Ocean, of course, argues that *Tokio Marine* is dispositive. G.F., on the other hand, contends that we must take the case *en banc* to "resolve the conflict between *Tokio Marine* and *Portland Fish*" and to overrule the "wrongly decided" *Tokio Marine* case. We conclude that *en banc* review is inappropriate because *Tokio Marine* and *Portland Fish* are not in conflict.[4] Furthermore, we think *Tokio Marine* is directly on point and, accordingly, we reverse the district court and uphold the Wood Clause.

The Rust Clause at issue in *Tokio Marine* was almost identical to Pan Ocean's Wood Clause. In fact, the major difference between the two is the following emphasized language, added by Pan Ocean to encompass certain wood damage:

THE TERM APPARENT GOOD ORDER AND CONDITION WHEN USED IN THIS BILL OF LADING WITH REFERENCE TO IRON, STEEL OR METAL PRODUCTS *OR WOOD PRODUCTS* DOES NOT MEAN THAT THE GOODS, WHEN RECEIVED, WERE FREE OF VISIBLE RUST *OR MOISTURE STAINING, CHAFING AND/OR BREAKAGE.*

---

4. Thus, we need not consider Pan Ocean's argument that, because G.F. never filed a cross-appeal, it may not now seek to enlarge its rights by

requesting *en banc* consideration of the case to procure total invalidation of the Wood Clause (including the parts validated in *Tokio Marine* ).

In *Tokio Marine,* we concluded that estoppel was inappropriate because, by inserting qualifying language into the bills of lading, the carrier essentially made no representations about the condition of the cargo. Our rationale in no way depended on the progressive nature of rust or the specific language of the clause. As a result, we see no reason not to apply the same logic to this case: Pan Ocean made no representations about whether the doorskins were stained, chafed, or broken.

*Portland Fish* does not require a contrary result. In that case, we merely followed a line of authority establishing "that disclaimers such as 'particulars declared by shipper,' 'shipper's weight,' or 'said to be' do not render an otherwise clean ocean bill of lading 'foul.'" *Portland Fish,* 510 F.2d at 633 n. 15. Thus, we deemed the carrier to have made actual representations in the bill of lading about the weight of the cargo. We therefore estopped the carrier from asserting that it received a smaller shipment of fish than that represented in the document.

The district court below overlooked this critical difference between the two cases. The rule that a "said to weigh" qualification does not render a bill of lading unclean explains why the plaintiff in *Portland Fish* could justifiably rely on the representations in the document. In contrast, because courts had not failed to enforce a Rust Clause, the plaintiff in *Tokio Marine* could not reasonably ignore the plain language of the qualified bill of lading.[5]

This distinction is probably why the courts that have applied *Tokio Marine* have not seen fit to even mention *Portland Fish. See Acwoo Int'l Steel Corp. v. Toko Kaiun Kaish, Ltd.,* 840 F.2d 1284, 1287–88 (6th Cir.1988) ("A bill of lading with a rust clause, however, is not 'clean' and cannot be used to establish delivery of the steel to a carrier free of rust."), *on remand to* 736 F.Supp. 1452, 1460 (E.D.Mich.1989) ("the bills of lading, qualified as they are by the Retla rust clause, cannot establish delivery in good order and condition standing alone"); *Gradmann & Holler GmbH v. Continental Lines, S.A.,* 504 F.Supp. 785, 788 (D.P.R.1980) ("Where, as here [with a Rust Clause], a plaintiff is confronted with a shipping documentation situation whereby his bill of lading contains exceptions, it then becomes his burden to prove that the goods were in good order and condition at the point of origin before shipment."); *Dorsid Trading,* 343 F.Supp. at 623 ("Nor can such a bill, qualified by the Retla clause

5. The record indicates that many commercial banks treat bills of lading with Rust or Wood Clauses as "clean" bills. In fact, in this case Banque Indosuez paid Pyramid under G.F.'s letter of credit because it considered Pan Ocean's bills of lading to be clean. This practice clearly disturbed the district court:

> [The] Wood Clause, if validated, creates a situation that is ripe for abuse. Specifically, the shipper may only receive payment if it obtains a "clean" bill of lading from the carrier. Since the international banking community treats a bill of lading that contains a Pan Ocean Wood Clause as "clean," the shipper may deliver damaged wood to the carrier and accept a bill of lading containing such a clause. The shipper receives payment long before the consignee can inspect the wood, while the carrier may deny that the wood was in good order and condition at the point of origin. The burden is thus unfairly shifted to the innocent consignee, who is left attempting to demonstrate the condition of the wood delivered many months prior to a distant port.

795 F.Supp. at 1006 (citation omitted). As noted by another federal court, however, these *banking practices* provide no reason to ignore the plain meaning of a qualifying clause on the bill of lading:

> [A] "Retla clause bill" would be, by banking and commercial practice, designated as a clean bill of lading. Thus, a letter of credit requiring by its terms a clean bill would be honored upon presentation of a Retla clause bill. This practice thwarts the very safeguard that letters of credit are meant to impart; that is, the actual receipt of goods in a specified order and condition.
>
> Moreover, it is worthy of note that prevention of this undesirable result by requesting a substitute bill is perhaps a less realistic alternative than might be initially assumed. Often the cargo claimant is a consignee of cargo who is not a party at interest at the time of the original contract between the shipper and the carrier. Since the Retla clause bill of lading is advantageous to both the shipper of cargo and the carrier, there is little likelihood that such a request will be made. It is fair to state, then, that the consignee of cargo might be placed ultimately in a more difficult position through use of this type of bill of lading. However, *this aspect alone does not persuade this Court that the Retla clause should be held invalid under COGSA. Instead, the guiding principles to be applied are those capsuled in Tokio Marine.*

*Dorsid Trading Co. v. SS Rose,* 343 F.Supp. 617, 623–24 (S.D.Tex.1972) (emphasis added).

and thus containing no representations with respect to rust and moisture conditions of the cargo, be made the basis of an estoppel."); *cf. Plywood Panels, Inc. v. M/V Sun Valley,* 804 F.Supp. 804, 809–11 (E.D.Va.1992) (refusing to enforce a "Lumber Clause" because it was buried in fine print on the back of the bill of lading and because it failed to allow for substitute documentation on request of the shipper), *aff'd,* 4 F.3d 986 (4th Cir.1993) (mem.); *Sumitomo Corp. v. M/V Saint Venture,* 683 F.Supp. 1361, 1368–69 (M.D.Fla. 1988) (same).

▉ G.F. goes to great lengths to argue that *Tokio Marine* and its progeny are contrary to COGSA's ambiguous legislative history, which purportedly establishes that carriers may not avoid § 1303(3)'s bill of lading requirements by inserting qualifying clauses.[6] The thrust of G.F.'s argument is that once a shipper demands a bill of lading under § 1303(3), the carrier must provide a statement of the condition of the goods. We expressly rejected that contention in *Tokio Marine:*

> The [COGSA] feature to be emphasized ... is that such a bill of lading is to be issued only "on demand of the shipper." If the shipper accepts a bill of lading which does not show all the particulars listed, the document is entirely valid; the shipper need not insist upon everything mentioned.... If the shipper accepts a bill of lading which does not show the "apparent order and condition of the goods" the carrier is not guilty of any wrong, and cannot be held responsible for misrepresentations of the conditions of the goods.

*Tokio Marine,* 426 F.2d at 1378 n. 11 (quoting Wharton Poor, *Charter Parties and Ocean Bills of Lading* § 64 (5th ed. 1968)).

*See also Dorsid Trading Co.,* 343 F.Supp. at 623 ("It is evident that [COGSA] does not require the carrier to state the apparent order and condition of the cargo except when so demanded by the shipper. Thus, a bill which is limited or qualified in its statement as to the apparent condition of the goods is not in violation of COGSA unless a complete statement is demanded.").

We have, therefore, considered the statutory provision at issue and found it clear and unambiguous. As a result, we need not consider G.F.'s legislative history arguments. *E.g., Farr v. United States,* 990 F.2d 451, 455 (9th Cir.) ("We must follow the plain meaning of [the statute] and need not look to legislative history where [its] meaning is clear on [its] face."), *cert. denied,* —— U.S. ——, 114 S.Ct. 634, 126 L.Ed.2d 592 (1993). Accordingly, we hold that the Wood Clause is valid and reverse the district court.

### IV.

It is "just and practicable" to apply the amended version of Rule 15(c) to G.F.'s motion to add Pan Ocean as a defendant. Because Pan Ocean had sufficient notice of G.F.'s lawsuit and knew or should have known that, but for a mistake, G.F. would have named it as a defendant, the district court did not abuse its discretion by granting G.F.'s motion.

The district court erred, however, by invalidating Pan Ocean's Wood Clause. Under *Tokio Marine,* the clause was a valid qualification of the bill of lading. Because *Portland Fish,* which contained an entirely different qualification clause, does not compel a different conclusion, *en banc* review is unnecessary. Pan Ocean should not have been

---

**6.** To make this point, G.F. submitted in its supplemental excerpt of record the affidavits of Michael F. Sturley and William Tetley. Pan Ocean filed a motion to strike these affidavits from the record because they constitute legal argument rather than evidentiary matter. We agree and grant Pan Ocean's motion.

The affidavits explain the legislative history of COGSA and state that *Tokio Marine* is inconsistent with that history. Each is written in the form of a legal document, complete with subdivisions for discussion of the issues, the law, and the conclusions. This is impermissible. We

have "condemned the practice of attempting to introduce law as evidence." *United States v. Unruh,* 855 F.2d 1363, 1376 (9th Cir.), *cert. denied,* 488 U.S. 974, 109 S.Ct. 513, 102 L.Ed.2d 548 (1988). "[M]atters of law for the court's determination ... [a]re inappropriate subjects for expert testimony." *Aguilar v. International Longshoremen's Union Local 10,* 966 F.2d 443, 447 (9th Cir.1992). Because the interpretation of legislative history and the application of a statute to a particular case are uniquely questions for the court, we strike the affidavits from the record.

estopped from asserting that Pyramid delivered damaged doorskins to it.

**REVERSED. REMANDED** for proceedings consistent with this opinion.